Wilkins, Douglas H., J.
The plaintiffs are twelve individuals and companies who have sued Fitchburg Gas and Electric Light Company (“FG&E” or “the Company”) for damages and injunctive relief arising out of alleged injuries suffered during a major ice storm in 2008 (“Winter Storm 2008”). In a decision dated September 2, 2009 (“Motion to Dismiss Decision”) [26 Mass. L. Rptr. 107], the Court dismissed several counts for failure to state a claim upon which relief can be granted. It left two counts for adjudication: the gross negligence claim (Count I) and the two Counts under G.L.c. 93A (Count IV (§9 claim) and Count V (§11 claim)). FG&E filed a Motion for Summary Judgment as to Plaintiffs’ G.L.c. 93A Claim (“Motion”), which the plaintiffs have opposed. The Plaintiffs have also filed a cross motion for summary judgment (“Cross motion”).
No matter the outcome of the Motion, the plaintiffs’ gross negligence claim will survive. It might arguably be more efficient to resolve that claim and the c. 93A claim together at trial, rather than entertain summary judgment. The Court has discretion to deny summary judgment even if warranted.[1] In part because the plaintiffs motion for class certification turns on the c. 93A question and in-part because granting the Motion would to some degree simplify the trial, the Court declines to exercise that discretion and proceeds to the merits of the Motion.
After a two-day hearing, the Motion is DENIED, except ALLOWED AS TO THE CLAIMS PROCESSING ISSUES AND AS TO INJUNCTIVE AND DECLARATORY RELIEF AFFECTING FG&E’S FRANCHISE.
BACKGROUND
The facts established by the Parties’ Rule 9A(b)(5) statement,[2] along with inferences drawn in favor of the plaiqtiffs as opposing party, are as follows.
FG&E is a public utility that provides electric service to customers in the City of Fitchburg and the towns of Lunenburg, Townsend and Ashby, Massachusetts. It is one of the utilities owned by Unitil Corporation (“Unitil”). Its terms of service are controlled by its Tariff filed -with the Massachusetts Department of Telecommunications and Energy (“DPU”).
Paragraph 9C of the Tariff disclaims FG&E’s liability for failure to supply electricity “if and to the extent that it shall be unable to do so or prevented from doing so ... by a break or fault in its transmission or distribution system ... or by reason of storm . . . [or] act of God.” However, it reinforces the limit on this exculpation (“if and to the extent” of force majeure and, therefore, not to the extent of FG&E fault) by adding that “the Company shall use reasonable efforts under the circumstances to overcome such cause and to resume full service.”
Section 9F of the Tariff provides:
The Company shall not in any event except that of its own gross negligence or willful acts, be liable to any parly for any direct, consequential, indirect or special damages, whether arising in tort, contract or otherwise, by reason of any services performed or undertaken to be performed, or a [sic] actions taken by the company . . .
Nothing in the Tariff purports to override any provision of the General Laws, including c. 93A. It specifically provides that the Tariff yields in the event of a conflict between it and any order or regulation of the DPU, or any provision of G.L.c. 164. A factfinder could conclude (if not conclusively established as a matter of law) that the bargain by which FG&E sells power to customers pursuant to DPU oversight includes the following.
When a public utility company accepts the rights and privileges of a franchise conferred to it by the Massachusetts Legislature to operate exclusively within a specified service territory, that public utility must undertake the obligations accompanying that franchise, including the provision of service in a safe and reliable manner. Such an obligation includes (but is not limited to) the responsibility to restore service in a timely manner when service to a customer has been interrupted.
Investigation by the Department of Public Utilities on its Own Motion into the Preparation and Response of Fitchburg Gas and Electric Light Company d/b/a Unitil into the December 12, 2008 Winter Storm (“DPU 09-01-A”), p. ix.
The plaintiffs are twelve residential and business customers of FG&E who lost power in part because of Winter Storm 2008 and, in part (they allege) because of FG&E actions and omissions. As FG&E customers, they have all paid for the package of utility services that FG&E has been authorized to provide, including reliable electric service.
THE STORM AND RESULTING DAMAGE
That storm struck the FG&E service territory on December 11 and 12, 2008, and affected all of FG&E’s approximately 28,000 customers. It caused ice to accumulate on utility poles, tree limbs and branches, causing limbs and sometimes whole trees to fall onto portions of FG&E’s electrical infrastructure, including utility poles, electrical lines and equipment. Most of the damage to FG&E’s infrastructure was caused by falling trees and limbs. The initial ice storm was followed by two snowstorms on December 20 and 21, 2008, respectively, as well as heavy rain and high wind on December 24, and December 25, 2008. On December 12, 2008, Governor Patrick declared a State of Emergency in Massachusetts, which remained in effect until December 29, 2008.
The named plaintiffs lived in the following towns and had experienced the following power losses during that period.
*125 Dec. 11 to 22 Gary Asher Lunenburg
Dec. 11 to 19 Dee Anne Aylott Fitchburg
Dec. 11 to 21 or 22 Daisy Bacener Lunenburg
Dec. 10 to 21 Marcia Bellerman Fitchburg
Dec. 11 to 17 Beverly Christenson plus 10 more days of heat loss Fitchburg
Catherine Clark Dec. 12 to 23 Lunenburg
Evans on the Common Dec. 11 to 14 Townsend
Carl Fandreyer Dec. 11 to 23 Fitchburg
Genghis, Inc. Dec. 11 to 19 Lunenburg
Lunenburg Exxon Dec. 12 to 19 Lunenburg
Jacquelyn Poisson Dec. 11 to 14 Fitchburg
Karen Thibault Dec. 11 to 23 Fitchburg
At the peak of the outages, 100% of FG&E’s customers lacked power.
EMERGENCY PREPAREDNESS
Prior to the Winter Storm 2008, FG&E in newsletters sent to customers extolled its ability to respond to outages and claims that “safety and service reliability are our first priorities.”
When Winter Storm 2008 hit, FG&E had in effect an Emergency Restoration Plan (“ERP”), which it filed with the DPU on a yearly basis. The ERP presents an overview of the restoration processes and priorities, defines organizational and functional responsibilities, identifies communications protocols, and describes the framework required to restore power in the event of a major storm or other emergency event. It includes a section on “Staffing or Emergency Positions,” which states that a “primary” and “backup” candidate was to be assigned to each key position in order to facilitate emergency restoration efforts. The ERP did not address a storm as severe and widespread as Winter Storm 2008.
FG&E is a member of the Northeast Mutual Assistance Group (“NEMAG”), formed in 2007 by a group of New England and Canadian electric utilities to enable its members to seek and provide utility crews to aid one another during major storm events. During the Winter Storm 2008, it had varying levels of success in obtaining support and crews through NEMAG. At the peak of its restoration efforts, FG&E had 299 crews working on its system. As a result of the storm, FG&E had to replace or repair 244 poles, 192,729 feet of wire conductor and 170 transformers.
Ultimately, at the request of the Massachusetts state government, a different utility, National Grid, stepped in and performed the necessary work to restore power to FG&E’s service area.
In 1992, after Hurricane Bob, DPU directed several utilities, including FG&E, to “implement or to maintain a system for reviewing their emergency plans on an annual basis” and noted that it “would be beneficial for each company to examine the other companies’ plans in order to consider the incorporation of any useful changes.” DPU 91-228, p. 4. While that statement may appear advisory by itself, the DPU’s actual order stated (p. 39):
V. Order
After due notice and consideration, it is ORDERED: that the Companies comply with the directives and recommendations contained herein. [Emphasis added.)
In the years after Hurricane Bob and prior to the Winter Storm 2008, FG&E did not study the storm preparation and response practices of other Massachusetts utilities.
Events other than Hurricane Bob also provided information about the requirements of an adequate ERP. In December 1996, FG&E experienced a multi-day outage after heavy, wet snow fell, prompting complaints from Townsend officials about the accuracy of information given to the public during the outages. In 2002, DPU advised FG&E to “consider the use of extreme weather condition forecasts with outages or contingencies simulated in the power flow model for plan[n]ing and designing [transmission and distribution] facilities.” Historically, severe storms in Unitil’s service area, causing ice accumulations of 1 inch or more, occurred in 1942, 1964, 1969-1970, 1979, 1986 and 1998. FG&E’s 2007 Electric System Planning Update acknowledged that, during the prior 18 months, FG&E’s system had most been affected by interruptions involving trees, accounting for 86% of total customer minutes of power lost on the ten worst performing circuits. For purposes of the Motion, the Court infers that FG&E could have foreseen a storm of the severity experienced in the Winter Storm 2008 by looking at storm histoiy in towns and areas adjoining its service area.
For summary judgment purposes, the Court takes it as established that FG&E’s preparation for and response to the storm was inadequate to address foreseeable events. In particular, FG&E was poorly prepared for a storm of the magnitude of the Winter Storm 2008. For purposes of summary judgment, the plaintiffs have established the truth of the DPU’s conclusion in 09-01-A that “Unitil’s preparation for and response to Winter Storm 2008 represented an unquestionable failure to restore service to customers in an efficient, effective, and timely manner, and that this constitutes a failure of the Company to meet its public service obligation to provide safe and reliable service.” The facts in the summary judgment record also warrant the same factual conclusion reached by the DPU in “DPU 11-01: relative to the Petition of FG&E d/b/a Unitil for Approval of a General Increase in Electric Distribution Rates, a Capital Cost Adjustment Mechanism, and a Revenue Decoupling Mechanism, dated August 1, 2011" (“11-01”):
We have not been faced with a situation... in which a company has so thoroughly mismanaged its response to a situation like Winter Storm 2008 and *126 compromised its responsibilities to the public . . . Here, the Company demonstrated what can be fairly characterized as an egregious failure to meet its public service obligation in multiple aspects of its preparation and response to Winter Storm 2008.
VEGETATION MANAGEMENT
At the time of the Winter Storm 2008, FG&E also had in effect a Vegetation Management Policy, which called for tree trimming to be performed in cycles over a period of years—meaning each circuit on the system was to be assessed and trimmed within a certain number of years. As of the end of 2006, FG&E was behind in its tree trimming schedule. Its vegetation management program was underfunded by $601,000 annually. It decreased its distribution vegetation management spending by 8-9% from $360,290 in 2006 to $330,195 in 2008. To address insufficient vegetation management budgets, FG&E adjusted its clearance standards and vegetation management cycles rather than increasing vegetation management budgets. In February 2007, FG&E’s projections predicted that its tree trimming program would be 3.5 years behind schedule at the end of the existing eight-year schedule. From 2004 to 2008, FG&E performed no distribution tree trimming at all in the Town of Ashby. In 2007, in an attempt to improve the Company’s performance on the service reliabilily indices submitted to and reviewed by the DPU, FG&E changed its trimming focus to emphasize the main line or backbone circuits or feeders. As a result, the Company’s trimming changes allowed vegetation to encroach on the Company’s lateral circuits.
The summary judgment record warrants adoption of DPU’s finding that FG&E’s vegetation management activities contributed to Ice Storm damage to its distribution system. Plaintiffs expert has testified that some (over 90% on some assumptions) tree-related outages occurring during a major storm such as the Ice Storm cannot be prevented by the utility. The record permits the conclusion, however, that FG&E’s inadequate vegetation management and other preventive efforts were responsible for at least some of the rest of the outages (up to 10% or more) of the outages, plus delay in restoration.
FG&E has produced no record evidence that the budgetary decrease or programmatic changes reflected a professional judgment that the reduced funding or program could or would result in sufficient vegetation management to produce a reliable electric distribution system for customers.
BUDGETARY ALLOCATION
The plaintiffs have linked inadequate preparedness with the compensation incentives Unitil placed on management.
According to its January 16, 2008 minutes, the Unitil Compensation Committee meeting “asked management to evaluate and comment on some suggested changes to the result areas and the relative weightings, including possibly placing more weight on Earnings Per Share (“EPS”] and Return on Equity.” Its CEO recommended increasing the incentive for management to improve EPS, at the expense of distribution rates charged. For the year 2008, Unitil ultimately increased compensation incentives for management for EPS (from 20% to 25%) and O&M cost per customer (from 15% to 20%). Those increases came at the expense of reliability (decreased from 20% to 15%) and residential electric rates (decreased from 20% to 15%).
Different conclusions are possible. At trial, it may turn out that these decisions merely reflected the normal profit motive and desire to cut costs that any private company must pursue as a matter of fiduciary duly to the shareholders. However, that is not the only plausible conclusion. A factfinder could find that FG&E’s new management compensation structure intentionally rewarded diversion of company revenue to shareholders and away from spending money to meet the company’s public service obligations to customers. In the likely absence of new revenue sources, the necessary consequence of the new incentive system was cost-cutting, including keeping the tree trimming budget underfunded. That could be consistent with FG&E’s obligations as a public service company if the company planned and budgeted its operations in a manner that, within a broad range of business judgment, allowed it to meet its public service obligations, including reliabilily of service and adequate storm preparation. FG&E has not, however, presented any evidence that it found a way to reconcile its budgetary decisions and priorities with a good-faith plan to provide arguably acceptable reliability during a major storm.
Given the company’s emergency planning and response performance before and during the storm, its explanations during the DPU hearings and the evidence supporting the DPU’s findings (including those quoted above), the summary judgment record would permit the conclusion at trial that FG&E never adopted or considered a plan and budget that would permit adequate storm preparation and response. It would also support the conclusion that the Company engaged in cost cutting or cost containment without sufficient corresponding efficiencies or appropriate adjustments in emergency preparedness. Accordingly, a factfinder could view the management incentive changes together with the other facts and circumstances—including the existing, inadequate preparation for a storm of the huge, but predictable, magnitude of the Winter Storm 2008—as proving that FG&E consciously diverted money paid by its customers and used those funds to benefit shareholders at the expense of providing a level of preparedness that met the reliability obligations of its franchise—for which FG&E’s customers paid.
*127 PUBLIC INFORMATION
FG&E issued between one and five daily public service announcements (“PSAs”) beginning on December 11 and ending on December 24, 2008. On December 11, 2008 at 9:37 A.M., FG&E was aware that the forecast was for “anywhere from 1/4 inch to more than 1 inch of ice,” that “the current thinking is that FG&E is in the worst position” of the Unitil subsidiaries and that “a forecast of over 1 inch would likely result in an extended restoration period that could easily exceed one week.” Nevertheless, at 1:15 P.M. that same day, FG&E issued a PSA that: “Most electrical outages are expected to be for relatively short periods of time, only. However, severe weather conditions can create substantial damage to the electrical system, and restoration can take an extended period of time.”
While the Company’s lack of planning for a storm as severe as the 2008 Winter Storm resulted in an inadequate number of damage assessment personnel, it nevertheless had information after the first few hours that the damages to its system was extensive and affected more than just the sub-transmission and primary distribution facilities. It received reports from customers, public safety officials and its own damage assessors of damage to laterals, secondaries and service cables. It knew that energizing its sub-transmission lines on the morning of December 14 did not restore service to a large majority of its customers. During this time it also learned that a number of repair crews previously thought to be available, would in fact not materialize.
Despite this knowledge, FG&E issued PSAs from the evening of December 12 through December 15, stating, that it would “take days” or “several days” to restore power. On December 16, the Company shifted language and referred to “restoration of all primary circuits in Massachusetts” by the end of the week—a statement that had a tendency to mislead customers into thinking that their power would be restored according to that schedule. Not until December 19 did the Company’s PSA refer to “extensive rebuilding of circuits,” even though it had information about the necessity for that rebuilding much earlier.
From December 11, 2008 through December 25, 2008, FG&E’s call center received 164,136 calls, of which 32,327 were answered by a call center representative (“CSR”). At least two plaintiffs (Paul O’Connell and Catherine Clark) testified that they spoke to an FG&E representative during the outage period. Clark was led to believe that power would be restored. O’Connell’s employees spoke with a CSR and were told, incorrectly, that FG&E expected the power to be back on within the next 24 hours or so. Other plaintiffs received comparable information by calling their local officials. As the DPU found, “the Company approached its communications with local officials in an ad hoc manner.”
Other plaintiffs listened to automated recordings when they attempted to call FG&E during the restoration period. The recordings did not provide any information about restoration time.
The summary judgment record permits a factfinder to reach the same conclusion that DPU reached regarding the call center.
The Company’s CSRs used the PSAs as the source of the information they provided to customers. As discussed below, this information (particularly during the first week of the Storm) was inaccurate and misleading. Thus, customers who were able to speak to a CSR were not provided useful information regarding the length of outages for which they should prepare.
The record also permits a factfinder to conclude, as DPU did, that
The Company’s failure in communicating the extent of damage resulted in the inability of customers to plan appropriately for an extended outage and for local officials to plan responses to meet local needs, which degraded the public’s confidence in the Company to fulfill its obligations, and increased the public safely risk associated with the Storm to the Company’s customers.
ESTIMATED BILLS
The DPU’s regulations permit utilities to issue estimated bills in certain situations, including where circumstances beyond a company’s control make it difficult to issue an actual bill. 220 Code Mass.Regs. §25.02(2). They require the utility to base the estimated bills upon a reasonable method of estimating consumption as approved by the Department. 220 Code Mass.Regs. §25.01.
In December 2008, the Company issued estimated bills, because the storm had made it impossible to take meter readings. Some meter readings would have occurred automatically if the power had been on. Plaintiffs Aylott, Bellerman, Clark, Evans on the Common and Genghis, Inc. received estimated bills. Some of the estimated bills reflected a higher than actual usage because they were based on historic consumption trends,, even though consumption was down in December 2008, because customers had no power. The December estimated bills did not include any bill insert or other message explaining the estimated bills. FG&E began receiving complaints from customers in late December about the estimated bills.
FG&E’s policy was to provide a “true up” of an estimated bill on the following bill, following a reading of the customer’s actual usage. The policy provided for a reduction in the second bill to account for any overpayment made in response to an estimated bill. On December 29, 2008, FG&E issued a statement on estimated bills, explaining the process for computing an estimated bill from prior years’ data when a meter reading is impossible and stating, “[d]ue to the ex *128 tended outages from the ice storm, a large number of customers have received estimated bills than is normal.” In a statement issued January 26, 2009, FG&E informed customers that it “issued estimated bills to approximately 15% of our Massachusetts customers due to the ice storm.” It directed customers who had questions about the estimated bills, or who wished to pay only a portion of the bill until it was reconciled, to a CSR.
The five plaintiffs received estimated bills, like others similarly situated, later received a bill that reflected actual electrical consumption. They assert that they lost interest and opportunity cost on the inflated estimated bills. Looking only at payment of principal, no customers paid for more electricity than they actually consumed.
A factfinder could conclude, as DPU did, that the decision to send out estimated bills was appropriate, but the use of standard estimating methods without adjusting for the fact that customers were without power was not appropriate. Given the regulation requiring use of a reasonable estimation method, a factfinder could also conclude that sending estimated bills that systematically overestimated usage without adjusting for the outage was unfair and deceptive.
DEMAND LETTER
On or about January 6, 2007, the plaintiffs sent a c. 93A demand letter to FG&E. FG&E responded on February 4, 2009. The plaintiffs sent a supplemental c. 93A demand letter on February 23, 2009, to which FG&E responded on March 23, 2009.
DISCUSSION
The Motion turns on a single issue: the sufficiency of the evidence to support a c. 93A claim. On summary judgment, the moving party has the burden to demonstrate that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Foley v. Boston Hous. Auth, 407 Mass. 640, 643 (1990). The movant may meet this burden by showing that the plaintiff has no reasonable expectation of producing evidence on a necessary element of his case. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party meets the burden, the opposing party must advance specific facts that establish a genuine dispute of material fact. Id.
I.
A. Test for Liability
The existence of an unfair or deceptive practice within the meaning of G.L.c. 93A, §2 turns on “(1) whether the practice ... is at least within the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; [and] (3) whether [the actions of the defendant] cause substantial injury to the [plaintiff].” PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). Accord, Morrison v. Toys “R” Us, Inc., 441 Mass. 451, 457 (2004). A public utility regulated by the DPU may be subject to liability for unfair and deceptive practices under c. 93A, as long as the complaint does not directly challenge the DPU’s rates or other regulatory actions. Lowell Gas Co. v. Attorney Gen., 377 Mass. 37, 41-43 51 (1979).
A violation of c. 93A “requires, at the very least, more than a finding of mere negligence.” Darviris v. Petros, 442 Mass. 274, 278 (2004). A course of conduct that is “both knowing and intended to secure ‘un-bargained-for benefits’ to the detriment of the other party” amounts to unethical, unfair and deceptive acts in trade or commerce, in violation of G.L.c. 93A. See Zabinv. Picciotto, 73 Mass.App.Ct. 141, 169-70 (2008), rev. den. 453 Mass. 1105 (2009), quoting NASCO, Inc. v. Public Storage, Inc., 29 F.3d 28, 34 (1st Cir. 1994), and citing cases. Cf. Arthur D. Little Intern., Inc. v. Dooyang Corp., 979 F.Sup. 919, 925 (D.Mass. 1997), affd, 147 F.3d 47 (1st Cir. 1998) (Company violated G.L.c. 93A by failing to comply with clear obligations for the purpose of extorting concessions to which it was not entitled). A business violates c. 93A where its actions lack any foundation at all, and go well beyond the rough and tumble of ordinary business transactions. See Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979), abrogated in part by Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995) (rejecting “level of ras-cality” test).
Beyond proving an unfair or deceptive practice, “to recover under c. 93A, §9, a plaintiff must prove causation—that is, the plaintiff is required to prove that the defendant’s unfair or deceptive act caused an adverse consequence or loss.” Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 490 (2012); see also Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 445 Mass. 790, 792 (2006) (An “essential predicate for recovery” under G.L.c. 93A is that “a causal relationship exists between the misrepresentation and the injury”).
“Causation is established if the deception ‘could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.’ ” Casavant v. Norwegian Cruise Line, Ltd., 76 Mass.App.Ct. 73, 77 (2009), affd on other grounds, 460 Mass. 500 (2011), quoting Hershenow at 445 Mass, at 801. Causation can also be established by determining whether the nondisclosure was of a material fact. In the context of c. 93A claims based on nondisclosure, “[mjateriality ... is in a sense a proxy for causation.” Gilleran, The Law of Chapter 93A §4.16, at 185-86 (2d. ed. 2007) (noting that this view is supported by the court’s definition of deception in Lowell Gas Co. v. Attorney Gen. ,377 Mass, at 51), cited in Casavant, 76 Mass.App.Ct. at 77-78. While the Supreme Judicial Court found it unnecessary to reach the latter aspect of causation in Casavant, the Appeals *129 Court’s reference to Lowell Gas is particularly apropos in this c. 93A utilities case.
Logically, .the adequacy of the plaintiffs’ showing requires consideration of two separate theories of liability: lack of preparedness and false or misleading information after the outages occurred. The Court treats those two theories separately.
B. Motion to Dismiss Decision
The Company argues that the plaintiffs’ lack-of-preparedness theory is, at best a negligence claim outside the scope of G.L.c. 93A. It relies upon the Court’s Motion to Dismiss Decision (at 7), which stated:
As the court has already explained, FG&E’s Tariff limits FG&E’s liability to damages caused by “its own gross negligence or willful acts.” Plaintiffs’ G.L.c. 93A counts, however, allege FG&E acted knowingly and willfully. Their allegations that FG&E knew its storm preparedness and response systems and plans were completely inadequate, but did nothing to remedy those deficiencies, are sufficient to rise to the level of unfair or deceptive acts or practices to sustain a G.L.c. 93A claim based on the standard announced in Iannacchino, 451 Mass, at 636.
Lifting language from that passage, the Company claims that G.L.c. 93A requires proof that preparedness and response were “completely inadequate” and that it “did nothing” to remedy the deficiencies. FG&E essentially argues that, as long as it had some degree of preparedness, it could not be found liable under G.L.c. 93A. It points to its ERP, arrangements to recruit additional utilily crews and “having procedures in place to deal with major storms.” It then argues that it had taken some actions to prepare for a major storm that were not completely inadequate.
The Company is absolutely correct that it took some steps to deal with outages caused by a major storm, including joining NEMAG, making arrangements with utility crews, adopting an ERP, trimming trees and assigning key personnel to handle storm duty. FG&E’s argument that it did “something,” however, does not negate the possibility that it knowingly and willfully engaged in an unfair and deceptive practice. The Court did not rule that “doing something” was enough to avoid c. 93A liability. The Court’s language at the motion to dismiss stage merely summarized key allegations of the Complaint. To say that those allegations suffice does not mean that a different (or even lesser) showing on summary judgment necessarily falls short.[3] The Court therefore must evaluate all of the facts placed before it on summaiy judgment in light of the existing case law on c. 93A liability.
C. Preparation and Restoration Claims
If believed at trial, the plaintiffs’ evidence warrants a conclusion that FG&E (1) made a conscious, financially-motivated decision to shortchange emergency preparedness in contravention of DPU advice or directives, its own representations to customers and its public service obligation, and then (2) actively concealed its known lack of capacity and the resulting length of power outages by knowingly distributing misrepresentations to the public. This conclusion may flow from the following facts, based upon the plaintiffs’ evidence and reasonable inferences drawn in their favor.
FG&E represented to its customers that emergency preparedness, i.e. that “safely and service reliability” were its “first priorities”;
FG&E “demonstrated what can be fairly characterized as an egregious failure to meet its public service obligation in multiple aspects of its preparation and response to Winter Storm 2008,” as DPU also found;[4]
Contrary to the advice of DPU in the Hurricane Bob matter, FG&E did not review emergency management plans of other utilities; nor did it consider a realistic history of storms in nearby areas to determine what severity might be expected in the service area; these failures contributed to its lack of preparedness for storm as severe as Winter Storm 2008;
FG&E decided to underfund its vegetation management program; actually cut funding for that program; adjusted its clearance standards and vegetation management cycles rather than increasing vegetation management budgets; and allowed vegetation to encroach on the Company’s lateral circuits due to the Company’s trimming changes;
FG&E adopted a new management compensation structure that intentionally rewarded diversion of company revenue to shareholders and away from spending money to meet the company’s public service obligations to customers.
FG&E issued false and misleading PSAs after the storm hit, including underestimates of the length of outages; it knew before the storm hit that outages would easily exceed one week, given its awareness of predictions for inch-thick accumulations and its lack of preparations for such a severe storm; within days after the storm hit, it had information sufficient to know that it could not restore power within a few days, but persisted in saying to the contrary publicly.
If all of this occurred, it happened in a market where FG&E has a monopoly. That monopoly context adds to any unfairness. The plaintiffs had no alternative supplier of electricity. For its part, FG&E’s management could act without fear that a massive failure to meet the public service obligation would doom the Company’s competitive prospects.
The Company may, of course, prove that this is not what happened. The Court will not, however, view each alleged misstep separately, as the Company’s argu *130 ment does, at least implicitly. The Court views this course of conduct as a whole, because FG&E’s customers experienced the cumulative effects of all those shortcomings. It must also assume, on summary judgment, that the plaintiffs can prove the facts and conclusions set forth in the bullets above.
If proven, the Company’s conduct goes beyond mere negligence to the point where, under the case law cited above, it may be found immoral, unethical and unscrupulous. It also, lies within at least the “penumbra” of established concepts of unfairness, including common-law misrepresentation, the Attorney General’s regulations (940 Code Mass.Regs. §19.04)[5] and statutory or regulatory standards informing the Company’s public service obligations. In particular, the Company made deceptive or misleading statements (e.g. first and last bullets), including what may be found to be a cover-up of its known inability to restore power once it knew the storm’s predicted and actual severity. It failed to comply with existing legal standards (e.g. second and third bullets). Significant portions of its conduct were intentional (third, fourth and fifth bullets). If the fact-finder determines that the Company’s post-storm PSAs and other conduct constitute a cover-up, it may also conclude that FG&E was conscious of its wrongdoing at the time.
Because the Company minimizes the breadth of the plaintiffs’ casé, it never fully addresses the evidence that it committed an unfair and deceptive practice within the meaning of G.L.c. 93A. FG&E does argue that the facts fail to establish the necessary knowledge or willfulness under its Tariff and c. 93A. The plaintiffs have a sufficient prospect of proving otherwise at trial, particularly where FG&E incontestably knew of the facts set forth in all but one of the bullets, above, and could be found willfully blind as to its egregious failure to prepare for meeting its public service obligation.[6] The plaintiffs’ evidence may convince a factfinder that FG&E made knowing and conscious decisions to disregard DPU’s advice, knew that it had underfunded tree trimming, intentionally reduced management incentives regarding reliability and intentionally shifted value to shareholders at the expense of the reliability required by its public service obligations. Such a showing would also demonstrate the type of self-interest that puts c. 93A in play. See Bradley v. Dean Witter Realty, Inc., 967 F.Sup. 19, 29 (D.Mass. 1997) (conduct “intended to secure a benefit” for the defendant); Logan Equip. Corp. v. Simon Aerials, Inc., 736 F.Sup. 1188, 1204 (D.Mass. 1990) (“intentionally malicious motive”). The Company’s insistence that the plaintiffs have found no “smoking gun” may be true, but nothing in c. 93A departs from ordinary principles of proof by requiring the plaintiffs to produce a single, dispositive piece of evidence. Direct evidence of intent is rare; an inference of knowledge or intent is enough. See generally Massachusetts Superior Court Civil Jury Instructions, §1.2.7 (2nd Ed. MCLE 2011), and cases cited.[7]
FG&E contends that its pre-storm statements to customers constituted, at most, non-actionable puff-ery. Def. Mem. at 12, citing In re Ford Motor Co. Sec. Litig, 381 F.3d 563, 570-71 (6th Cir. 2004). See Kwaak v. Pfizer, Inc., 71 Mass.App.Ct. 293, 300-02 (2008) (“In analyzing these false advertising claims, the court will be forced to draw fine lines between actionable deception and permissible puffery”). That contention is for the factfinder to assess, on the facts of this case. See White v. ABC Home Inspections, Inc., 2000 WL 1473144, Middlesex Superior Court No. MICV-99-1833 (June 27, 2000) (Botsford, J.) [12 Conn. L. Rptr. 283], at Part II (leaving any characterization as puffery for the fact finder in a negligent misrepresentation case). Cf. Kabatchnickv. Hanover-ElmBldg. Corp., 328 Mass. -341, 344 (1952) (puffery is not sufficient to support a common-law misrepresentation claim). A trial may result in a finding that FG&E did not simply tout the high priority it gave to reliability and safety. The Company said in February 2006 and 2007 that “safety and service reliability are our first priorities.” That is not exactly true, as a matter of objective fact, when compared with the actual priorities contained in the management incentive plan. See Lowell Gas Co. v. Attorney Gen., 377 Mass, at 51 (distinguishingmatters of opinion from those “susceptible of actual knowledge”).[8]
The pre-storm statements have additional significance. They are part of the evidence from which a factfinder might find a deceptive or self-interested intent for shortchanging emergency preparedness. When added to the arguable cover-up after the storm hit, the statements may support a conclusion that the Company attempted to deceive the public as to the level of its efforts to prepare for a major storm. For that purpose, it does not really matter whether any particular statement was puffery or not.
Finally, the Company’s claim that it had “no self interest in avoiding preparations to deal with a major storm” (Def. Mem., at 13) raises only a dispute of fact, where the plaintiffs’ evidence shows that FG&E did avoid such preparations at the same time it increased its priority on return to shareholders and correspondingly decreased management incentives to focus on reliability.
At the summary judgment stage, the plaintiffs have advanced sufficient evidence of causation. They have testified that, had they known that longer outages were likely, they would have taken steps to minimize their losses, such as avoiding purchases of perishable food items, purchasing a generator of suitable size, draining pipes, obtaining alternate shelter and the like. Proof of these kinds of losses does not depend upon the reasons why the Company failed to restore power more promptly.
Moreover, the factfinder may draw reasonable inferences that the Company caused the protracted delays in restoring power to most plaintiffs 10-14 days *131 after the storm (over a week for all but three named plaintiffs, and 12 or 13 days for three of them). The sheer length of the power outage extended beyond all reasonable expectations (and the company’s own predictions) and occurred in the context of numerous planning and implementation shortcomings that are known to cause delay. From these and other facts, a factfinder could infer that the lack of preparedness was a substantial contributing factor in causing power outages of the duration suffered by the plaintiffs.
Because causation may be proven by inference, the plaintiffs need not necessarily prove what may be impossible: namely, that a particular untrimmed tree caused a particular customer’s outage that would not have occurred if that tree had been .pruned (as the Company insists the plaintiffs must prove). One may draw inferences from the facts that, for instance, the natural tendency of inadequate tree-trimming is preventable outages (indeed, that is the reason why utilities trim trees), and, for instance, the greatest number of downed poles occurred in Ashby which had had no tree trimming from 2004 to 2008. Even without drawing a direct correlation between the observed storm damage and the Company’s distribution vegetation management practices, a factfinder may conclude, as DPU did, that “the Company’s vegetation management activities contributed to storm damage on its distribution system,” which in turn at least delayed restoration on a system-wide basis for those customers who experienced extended delays. The plaintiffs have advanced sufficient evidence to prove that their reliance upon the Company’s emergency preparedness and associated representations produced tangible losses, quantifiable in dollars and cents.
To be sure, the amount of these losses—and the existence of other types of losses—may depend upon proof that FG&E’s failures caused power to be restored later than it should have been. Additional, less tangible losses may also have occurred. It is not necessary to assess the amount or degree of loss-^or the existence of losses that turn upon the delay in restoring power—in order to reach the conclusion that the plaintiffs have established issues for resolution at trial as to causation relative to the preparedness issues.
D. False and Misleading Post-Outage Information.
As to the misleading PSAs and other allegedly inaccurate information during the outages, the parties shift the focus of their disagreement. Rather than concentrate upon the issue of deception, FG&E emphasizes the need for proof of injury. To be sure, FG&E does not concede the falsify of its PSAs or other statements, but there is little doubt that the record permits a factfinder to reach the same conclusion that the DPU did, namely that FG&E issued misleading public service announcements that were of limited use and were not consistent with the information that FG&E had or should have had regarding the damage to its system, in violation of DPU 91-228 at 30. See Joint Statement of Facts ¶11 l(x).
One example proves the point. The Company asserts in this case that, based upon its knowledge at the time, it was prepared, but not for a storm of the magnitude of the December 2008 storm. On December 11, it knew that it was facing inch-thick ice on its lines and poles for which it was unprepared. It was on notice that “a forecast of over 1 inch would likely result in an extended restoration period that could easily exceed one week.” Yet, it failed to alert its customers to the Company’s inability to deal with a storm of that magnitude. Instead, it deceptively asserted that “Most electrical outages are expected to be for relatively short periods of time, only,”[9] and continued to minimize its lack of ability to restore power, particularly during the first week of outages. That is not a mere prediction,[10] because it purports to report the Company’s expectations, despite evidence from which a factfinder could determine that its actual expectation was for “an extended restoration period that could easily exceed one week.” The factfinder could also consider the Company’s knowledge at the time—which is now embedded in its defense on the intent question-—that it was not prepared for such a storm, since it had only prepared for storms of the magnitude previously seen in FG&E’s actual service area. A factfinder could determine that the Company lied to the public about its considered expectations.
FG&E’s main point regarding post-storm statements is that the “lack of injury deriving from the statements (as opposed to the power outage itself) warrants the entry of summary judgment.” Def. Mem., at 15. Two plaintiffs spoke to CSRs and were misled to believe that power would be restored. Other plaintiffs learned false and incomplete information about estimated restoration times from news reports, which inferably originated from the Company, given that FG&E distributed its PSAs to the media and no other source of such estimates appears.
The plaintiffs’ affidavits establish a triable issue whether the individual plaintiffs suffered losses from the misinformation. Those losses potentially include the cost of purchasing a generator (Aylott; Clark), spoiled food (all twelve plaintiffs), plumbing repairs from burst pipes (same). All plaintiffs also claim non-economic damages. They are “not required to show a quantifiable amount of actual damages” as long as they show that they “suffered some loss caused by the defendant’s allegedly unlawful conduct.” Chery v. Metropolitan Property and Casualty Ins. Co., 79 Mass.App.Ct. 697, 700 (2011).
Because this is a putative class action, the bigger question is whether injury exists on a class-wide basis. The plaintiffs assert that all of FG&E’s customers had a legally protected interest in safe and reliable service and timely restoration. They trace this right to the Company’s Tariff and the public service obligations *132 imposed by G.L.c. 164. In turn, they base their “legally protected interest" concept on Leardi v. Brown, 394 Mass. 151, 157-63 (1985) (inclusion of an illegal term in a lease invaded a legally protected interest sufficient to constitute injury under G.L.c. 93A even though the landlord did not attempt to enforce the unlawful provision). The Court agrees that loss of the plaintiffs’ continued electric service is sufficient to meet the “injury” requirements of c. 93A if caused by the company’s deceptive or unfair acts perpetrated by the Company. See Hershenow, 445 Mass, at 802 (if the “invasion” of “a consumer’s legally protected interests” actually “causes the consumer a loss” that consumer has redress under G.L.c. 93A).
Invasion of such an interest and a resulting loss is not enough, however. There must be a causal link between the loss and the C.93A violation. The plaintiffs recovered in Leardi not just because the landlord invaded their legally protected interests, but because the illegality (the unlawful lease provisions) caused injury, that is, that they “acted as a powerful obstacle to a tenant’s exercise of his legal rights.” Id., 445 Mass, at 800. The Court explained Aspinall on the same basis. Id. at 801 (false advertising caused consumers to act differently). The Court specifically rejected a more abstract approach.
Under the plaintiffs theory of ‘injury,’ any consumer contract, oral or written, that violates the requirement of law in any respect, i.e., is non-compliant with any statute, rule, regulations or court decision, automatically constitutes an ‘injury’ under G.L.c. 93A (is an injury per se) entitling the plaintiff to recover statutory damages, attorneys fees, and costs, even though the plaintiff cannot demonstrate that the illegal contract (the invasion of a legally protected interest) causes any loss. There is nothing to suggest that the Legislature ever intended such a result, it is contrary to the regulation promulgated by the Attorney General. . . and this court has never sanctioned that view.
Hershenow, 445 Mass at 801 (footnotes omitted).
The problem is that, without evaluation on an individual basis, there is no way to know whether a particular customer lost reliable service and failed to obtain prompt restoration because of the Company’s lack of preparedness or solely because of the natural consequence of an exceptionally severe weather event.
The plaintiffs understandably do not assert that customers have a legally protected right in preparedness as such. It is not until the lack of preparedness results in loss of power that injury occurs. To extend Leardi's “legally protected interest” principle to an amorphous concept like injury to “preparedness” as such would go well beyond the Supreme Judicial Court’s rationale in the case most favorable to the plaintiffs. See Leardi, 394 Mass, at 159 (court viewed the question before it as “a close one”).
The plaintiffs also speak in terms of a legally protected right to accurate information. That cannot be what Leardi means by a “legally protected right,” for purposes of defining the “injury” test under G.L.c. 93A, §9. The prohibition against deceptive practices itself protects a right to accurate information. If a violation of that prohibition were enough, then the separately stated requirement to show injury would be redundant and therefore meaningless. The same goes for the above-quoted passage from Hershenow.
E. Claims Settlement
FG&E seeks summary judgment on the plaintiffs’ claim that it unfairly denied post-storm customer claims for reimbursement for losses allegedly suffered due to the power outages. It argues that none of the named plaintiffs suffered any injury from such denial, because none of them submitted any claim to FG&E to recover for storm or outage-related losses.
The Company’s factual premise is correct. The plaintiffs point to no evidence that any of them submitted a claim to FG&E. Accordingly, they cannot meet the “injury” requirement of Hershenow. While other non-parties may well have suffered injury from unfair claims practices, that is not enough. To meet the causation requirement, the plaintiffs must show injury to themselves, not just other members of the public.
G.L.c. 93A, §9, does not “authorize purely ‘vicarious suits by self-constituted private attorneys-general.’ ” Leardiv. Brown, 394 Mass. 151, 161 (1985), quoting Baldassari v. Public Fin. Trust, 369 Mass. 33, 46 (1975).
Roberts v. Enterprise Rent-A-Car Co. of Boston, Inc., 445 Mass. 811, 814 (Mass. 2006).
It is not necessary to consider or adopt FG&E’s dubious assertion that unfair claims settlement practices by a utility do not violate G.L.c. 93A, simply because the Company is not an insurance company subject to G.L.c. 176D. Because the plaintiffs cannot meet the “injury” requirement, they have no claim for unfair settlement practices under G.L.c. 93A, §9 or, a fortiori, under the “loss of property” provisions of G.L.c. 93A, §11.
F. Estimated Bills
FG&E issued estimated bills based upon the estimated usage in December 2007, without adjusting them for the obvious fact that every one of its customers was without power for days and many of them lacked power for weeks. The fact that it later “trued up” those bills does not give it the right to overcharge knowingly in an estimated bill. The Company had the use of monies paid by its customers before the true-up bills. The customers lost interest. While that may be a small amount of money, it is enough to constitute injury as long as Leardi is on the books. Here, as in that case, the Company unlawfully asserted a right and gave the impression, at least *133 initially, that the consumer lacked a contrary remedy. If the landlord’s decision not to enforce the illegal clause in Leardi did not absolve it of liability, so FG&E’s belated invitation to call its customer service line to arrange for delayed payment—a suggestion that customers might view skeptically after all the problems with CSRs during the outages—cannot alter the violation when the estimated bills were sent in the first place. FG&E is not entitled to summary judgment on that claim.
II.
The plaintiffs have filed a cross motion for summary judgment, relying on facts that they assert are conclusively established by the DPU proceedings.
A. Claim and Issue Preclusion
1. Claim preclusion
Claim preclusion “prohibits the maintenance of an action based on the same claim that was the subject of an earlier action between the same parties or their privies.” Heacock v. Heacock, 402 Mass. 21, 24 n.4 (1988). This rule is premised “on the idea that the party to be precluded has had the incentive and opportunity to litigate the matter fully in the first lawsuit.” O’Neill v. City Manager, 428 Mass. 257, 259 (1998), quoting Heacock, 402 Mass, at 24. ‘There are three required elements for the invocation of claim preclusion: ‘(1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits.’ ” Baby Furniture Warehouse Store, Inc. v. Meubles D&F L’tee, 75 Mass.App.Ct. 27, 33 (2009), citing Kobrin v. Bd. of Regis, in Med., 444 Mass. 837, 843 (2005).
Claim preclusion does not apply here because at least the second element is missing. The two DPU proceedings at issue are the investigation (09-01-A) and the rate proceeding (11-01). The plaintiffs correctly state that “[t]he issue in 09-01-A was whether FG&E violated its public service duties as a public service corporation to provide safe and reliable electric service and to restore power in a timely manner.” PL Reply at 2. In 09-01-A, DPU expressly disclaimed authority to decide any issues under G.L.c. 93A, because the Legislature authorized it to do so only in cases authorized by G.L.c. 164, §§1F(7) and 102C, including violations of DPU codes of conduct, rules or regulations promulgated under G.L.c. 164, §§1A-1H, inclusive (which are not involved here). In 11-01, the issues involved fixing and establishing a reasonable rate for electric service, including the prudence or imprudence of expenditures made by FG&E. No issue arose under G.L.c. 93A
While the other elements of claim preclusion may be met—as the discussion of issue preclusion below suggests—the plaintiffs are not entitled to judgment on their c. 93A claims based upon claim preclusion, because the cause of action in this case is not the same as in DPU 09-01-A or DPU 11-01. Compare Massaro v. Walsh, 71 Mass.App.Ct. 562, 566 (2008) (finding claim preclusion applicable).
2. Issue Preclusion
The doctrine of issue preclusion, or collateral estop-pel, “prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies.” Heacock v. Heacock, 402 Mass. 21, 23 n.2 (1988). Contrary to FG&E’s lead argument (Def. Opp. at 9-10, 12-14), collateral estop-pel may apply when the second action is brought on a different claim. See Martin v. Ring, 401 Mass. 59, 61 (1987); Restatement (Second) of Judgments §27 cmt. b (1982).
“So long as there is an identity of issues, a finding adverse to the original parly against whom it is being asserted and a ‘judgment on the merits by a court of competent jurisdiction,’ [citations omitted] collateral estoppel may apply.” Martin, 401 Mass, at 61. That “last condition means that the tribunal rendering judgment just have authority by law to adjudicate the controversy.” Id. (applying issue preclusion to a decision of the Industrial Accident Board). When the determination of an issue in the previous judgment is essential to that judgment, then the determination is conclusive in a subsequent action between the parties, whether on the same or different claims. Alba v. Raytheon Co., 441 Mass. 836, 841 (2004).
Since the plaintiffs urge the Court to use the DPU’s findings as a ground to impose liability on FG&E, this case involves the offensive use of collateral estoppel:
“ ‘[T]he offensive use of collateral estoppel is a generally accepted practice in American courts’... and occurs when a plaintiff seeks to prevent a defendant from litigating issues which the defendant has previously litigated unsuccessfully in an action against another party.” Bar Counsel v. Board of Bar Overseers, 420 Mass. 6, 9 (1995), quoting Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. 737, 744 (1985). Thus offensive collateral estoppel “does not require mutuality of parties, so long as there is an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction.” Miles v. Aetna Cas. & Sur. Co., 412 Mass. 424, 427 (1992) (Miles). ‘The central inquiry then becomes whether the issue on which preclusion is sought has been ‘the product of full litigation and careful decision.’ ” Id., quoting Home Owners Fed. Sav. & Loan Ass’n v. Northwestern Fire & Marine Ins. Co., 354 Mass. 448, 455 (1968). “A defendant must also have [had] a ‘full and fair opportunity to litigate the issue in the first action.’ ” Matter of Goldstone, 445 Mass. 551, 559 (2005), quoting Matter of Cohen, 435 Mass. 7, 15 (2001). See Restatement (Second) of Judgments §29 (1982) (listing eight circumstances forjudge to consider when determining propriety of applying offensive collateral estoppel). Ultimately, *134 “[flairness is the ‘decisive consideration’ in determining whether to apply offensive issue preclusion.” Matter of Goldstone, supra, quoting Matter of Cohen, supra at 16. Accordingly, we afford the trial judge “wide discretion in determining whether” applying offensive collateral estoppel “would be fair to the defendant.” Bar Counsel v. Board of Bar Overseers, supra at 11, citing Whitehall Co. v. Barletta, 404 Mass. 497, 502 (1989).
Pierce v. Morrison Mahoney LLP, 452 Mass. 718, 729 (Mass. 2008).
FG&E had a full adjudicatory hearing, lasting 5 days,.in 09-01-A. It had the right to present evidence, cross examine witnesses under oath, subpoena witnesses and present oral and written arguments. It employed competent counsel, presented a vigorous defense and had every incentive to persuade its supervisory agency, the DPU, of the prudence and correctness of its judgments and actions.
FG&E fully litigated both proceedings and had great incentive to do so. The result of 09-01-A was significant additional direction by DPU, additional tasks to perform and loss of management discretion. In the rate hearing, substantial monies were at issue:
Here, the Company demonstrated what can be fairly characterized as an egregious failure to meet its public service obligation in multiple aspects of its preparation and response to Winter Storm 2008. [Footnote omitted.] . . . The Department finds that the comprehensive nature of the Company’s failure to provide safe, reliable service warrants denying recovery of all legal and consulting costs associated with those failures, and supports the conclusion that the Company’s shareholders should absorb the costs of defending the Company in this unique set of circumstances. Accordingly, we deny recovery of $1,184,562 in costs associated with D.P.U 09-01-A, which results in a reduction to the Company’s cost of service of $394,854.
DPU 11-01, pp. 22-23. After considering other rate components, DPU ultimately decreased the Company’s proposed cost recovery associated with Winter Storm 2008 by “approximately $3.8 in carrying costs that the Company proposed to recover from its ratepayers over the seven-year amortization period.” Id. at 73. It also adjusted the Company’s return on equity.
It is true that both DPU hearings—like virtually all such economic regulatory proceedings—contained a public hearing component at which citizens, officials and businesses had the opportunity to submit statements. Many of those statements were submitted under oath. Even if others were not under oath, FG&E had the opportunity to object when those portions of the record were introduced (particularly at the rate hearing), the right to subpoena and cross examine persons who had submitted unsworn statements and the right to appeal any DPU findings, including those that may have been based upon unsworn testimony. The parties have cited no case in which the courts declined to apply issue preclusion to an administrative agency determination, made after an adjudicatory hearing, because the administrative process also included a public hearing.
To a large extent, the nature of the DPU’s findings eliminates FG&E’s concern over the statements made by individual plaintiffs during the DPU public hearing. While FG&E may be correct that some plaintiffs testified differently before the DPU and on deposition in this case, the DPU did not make findings regarding the injury or losses suffered by individuals, including the plaintiffs. Nor would the Court consider the DPU findings as establishing anything more than the scope, nature, strengths and shortcomings of the Company’s response to Winter Storm 2008 and the adequacy of that response in light of the regulatory directives and other guidance that the Company had before and during the storm. As to the issues that might have preclusive effect in this case, therefore, FG&E had a full and fair opportunity to litigate them at least once, if not twice.
FG&E also opposes issue preclusion on the ground that the New Hampshire Public Utilities Commission (“NHPUC”) investigated Unitil’s response to the same storm and found that Unitil’s “deficiencies and response planning and procedures . . . were not unreasonable.” In applying the doctrine of issue preclusion, the Court should consider whether “[t]he determination relied on as preclusive was itself inconsistent with another determination on the same issue.” Bar Counsel, 420 Mass, at 11. A negative finding in Massachusetts is not inconsistent with an exculpatory finding in New Hampshire. Each jurisdiction evaluated a local utility’s response to the problems in the geographic area within its borders. The two agencies considered their own precedents and statutory framework, including DPU’s Hurricane Bob decision. A major focus of the NHPUC’s investigation was determining whether Unitil devoted disproportionate resources to Massachusetts (a question it answered in the negative, consistently with DPU). NHPUC did not otherwise evaluate the Massachusetts response. The Court finds no inconsistency between the two administrative decisions, which assessed the responses in different geographic areas of Unitil’s different subsidiaries, using the statutory provisions and (perhaps most importantly) the regulatory history of two different jurisdictions.
At this stage of the proceedings, the Court is satisfied that the use of offensive issue preclusion is appropriate. If this case goes to trial, the trial judge will continue to have discretion to make the fincil decision as to what issues are already determined and what issues remain for trial.[11]
B. Merits of Plaintiffs’ Claims
Based upon the DPU findings, FG&E was woefully unprepared for a storm of the magnitude of Winter *135 Storm 2008 in that (1) it did not contemplate storm events more significant than had previously occurred in FG&E’s service territory, (2) it did not adequately plan or train company personnel for all facets of a significant outage event such as the Ice Storm, (3) it failed to comply with the directives of DPU 91-228, (4) it underfunded its vegetation management activities, failed to adhere to its tree trimming schedule, did not adopt an effective program to identify and remove trees that could threaten its lines, and it cut back its program for trimming trees on its lateral circuits. It misled customers through inaccurate pre-storm statements and issued false and deceptive PSAs and information provided by its CSRs during the restoration period.
Under the tests described above, however, inadequate preparation by itself is little more than negligence (or gross negligence), which is not enough to show a c. 93A violation. The system-wide inadequacy does not, moreover, demonstrate that any particular plaintiff was injured by an unfair or deceptive act, as opposed to by the natural consequences of the story. The DPU findings regarding misleading or deceptive pre- and post-storm statements apply to the public generally, but do not prove that any particular plaintiff suffered “injuiy” sufficient to make out a c. 93A claim.
Even if the Court grants preclusive effect to the issues found by the DPU, genuine issues of material fact still remain for trial. The plaintiffs have submitted affidavits in this case sufficient to show individual injury. The Company has, however, introduced contrary evidence, including proof that outages were inevitable in a storm of that magnitude and that extended restoration times were to be expected, regardless of the lack of preparation or the growth of any particular tree.
Application of issue preclusion therefore is not enough to satisfy the plaintiffs’ burden as moving parties under Rule 56 to show that, as individuals they are entitled to judgment as a matter of law.
III.
FG&E also seeks summary judgment with respect to all claims for injunctive and declaratory relief.
There is no question that, as a general matter, the Court has authority to enter injunctive relief. G.L.c. 93A, §§9(1), (3), 11. See Herman v. Home Depot, 426 Mass. 210 (2002). The scope of equitable relief sought by the plaintiffs is, however, daunting: revocation of FG&E’s franchise (or its right to exercise its franchise); appointment of an equitable receiver; an injunction ordering FG&E to provide service in a safe and reliable manner, including restoration of service in an efficient, effective and timely manner and not to issue estimated bills which it knows are inaccurately high; an injunction that FG&E institute appropriate remedial measures and compliance programs; appointment of a monitor or special master to oversee compliance with the injunction. In the alternative the plaintiffs seek declaratory relief.
In general, without a finding of liability, it is premature for the Court to venture into the area of remedy. Injunctive relief requires assessing current practices, which are not fully discussed in the summary judgment papers. Declaratory relief requires an “actual controversy,” which may or may not still exist regarding certain historic practices that may have been altered or discontinued. The summary judgment record is silent on the extent to which the plaintiffs remain threatened by the practices that led to the debacle in December 2008.
Ordinarily, that would be enough, but the plaintiffs motion for class certification requests, in the alternative, certification of a class for injunctive or declaratory relief. Accordingly, the Court sets forth its analysis of the current viability of the plaintiffs’ requests for declaratory and injunctive relief, without prematurely entering judgment on questions of liability.
The Court does not have power to revoke FG&E’s franchise or the right to exercise that franchise. Numerous statutes require DPU approval for a company to divest itself of its facilities or transfer its franchise. G.L.c. 164, §lA(b)(l), 21, 96, 100. Section 21 actually requires “the authority of the general court” for an electric utility to transfer its franchise. While the Court has equitable powers, it does not have the power to override these statutes. ‘The grant of equitable powers does not permit a court to disregard statutory requirements.” T.F. v. B.L., 442 Mass. 522, 533 (2004), quoting Freeman v. Chaplic, 388 Mass. 398, 406 n.15 (1983). That is all the more true where, as here, the DPU has expertise and the ability to hold service-area-wide hearings that this Court lacks. The appointment of an equitable receiver is tantamount to transferring the Company’s assets and franchise and is beyond this court’s powers for the same reasons.
The other requests for injunctive relief deal with areas that the DPU addressed in DPU 09-01-A and which may no longer present the same need for relief. The DPU notes that some improvements in.the Company’s practices apparently led to better performance in subsequent storms. The Legislature itself has stepped in to address, among other things, the Company’s storm response, by enacting G.L.c. 164, §1J, 85B. Those statutes, like those already on the books, gave DPU, not the Court, the regulatory oversight to scrutinize and supervise emergency response plans and to promulgate rules and regulations for “acceptable performance for emergency preparation and restoration of service” for electric utilities. G.L.c. 164, §§1J, 85B. See also G.L.c. 25, §§4B, 4C. The DPU has also enacted regulations addressing many of the issues raised by the plaintiffs regarding the lessons of Winter Storm 2008. See 220 Code Mass.Regs. 19.00. The plaintiffs have not shown a current need for an injunction ordering FG&E to provide service in a safe *136 and reliable manner, including restoration of service in an efficient, effective and timely manner. The same is true of the vaguely-worded request for an order that FG&E institute appropriate remedial measures and compliance programs. At the same time, the Company bears the burden of production on summary judgment. In the absence of a showing that it no longer engages in the practices that may violate G.L.c. 93A, it is not entitled to summary judgment.
The remedial measures ordered by the DPU also included prohibition of estimated billing without approval of a revised estimation methodology. That may also affect or obviate the need for a Court injunction, including the request for an order not to issue estimated bills which the Company knows are inaccurately high. On this point, again, the Company has not carried its burden on summary judgment to show that the plaintiffs cannot prove that the existing estimated bill methodology has eliminated the previous unfair and deceptive elements.
CONCLUSION
For the above reasons, the Court ORDERS AND ADJUDGES THAT:
1. The Motion of Defendant Fitchburg Gas and Electric Light Company for Partial Summary Judgment is DENIED, except ALLOWED ONLY AS TO CLAIMS SETTLEMENT PRACTICES AND INJUNC-TIVE AND DECLARATORY RELIEF AFFECTING FG&E’S FRANCHISE.
2. The Plaintiffs’ Cross motion for Partial Summary Judgment as to Liability and Multiple Damages is DENIED.

Despite the apparently mandatory language of Mass.R.Civ.P. 56, “even if on the established facts entry of summary judgment would have been warranted, a motion judge nevertheless has discretion to deny summary judgment because a particular issue or an entire action should not be foreclosed at that early stage.” Phelps v. MacIntyre, 397 Mass. 459, 461 (1986); see Ruggiero v. CostCL, 28 Mass.App.Ct. 967, 968 (1990).

he 9A(b)(5) statement and responses thereto unnecessarily complicate the matter by presenting a number of facts that are not material, setting forth quotes from testimony rather than facts to be found based on all the evidence, and providing argument and non-responsive recitations rather than clear “admit” or “deny” responses. Where proposed fact's are not denied explicitly or by necessary implication, the Court has often taken those facts as admitted, as provided by Rule 9A(b)(5).

Nhat is particularly true where the complaint need not articulate the legal theory upon which the plaintiff may prevail, as long as it alleges sufficient facts. See Pontremoli v. SpauldingRehabilitationHosp., 51 Mass.App.Ct. 622, 626n.4 (2001). An attack upon the complaint’s failure to plead a particular legal theory is outside the scope of summaiy judgment. See Smithv. Massimiano, 414Mass. 81, 85 (1993).

For purposes of FG&E’s Motion, it is not necessary to treat DPU’s findings as established by issue preclusion. It is enough that the record would permit a fact finder to reach the same conclusion that DPU reached. In any event, as noted below, part IIA, DPU’s findings do have preclusive effect on those issues that are relevant to this case.

In relevant part, that regulation reads: “It is an unfair or deceptive act or practice for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or . . . through the use of any misleading . . . representation, which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer, or that has the effect of deceiving or misleading a reasonable consumer, in any material respect. . .”

It is therefore unnecessary to determine whether the Tariff may limit the scope of c. 93A violations for which the Company may be held liable. The Court does note, however, that the Company’s reliance on the Tariff highlights the two-way obligations at issue, where the customer pays not only for electricity consumed, but for the Company’s efforts to fulfill its public service obligation.

Nor is the Company entitled to judgment because “DPU sets FG&E’s rates to allow it to recoup its expenses.” Def. Mem. at 14 and n.7, citing Town of Hingham v. Dep’t of Telecomm. & Energy, 433 Mass. 198, 202-03 (2001) (describing the DPU’s method of calculating the company’s rate base). Prospective ratemaking assumes a future expense level, allowing the Company to increase its profits if it later spends less than provided in the rates. See also Lanzalotta Aff., p. 17. Moreover, the Company in fact acted to induce its management to increase return to shareholders, while reducing incentives to increase reliability. It would hardly have bothered if the rate making process made it impossible to achieve the goals implied by those incentives.

Even before the realignment of priorities in 2008, the priority for earnings per share (20%) shared “first priority” status with reliability (20%). At the time of the storm, those priorities ranked earnings per share (25%) and O&M costs (20%) well ahead of reliability (15%).

The Court is aware that the next sentence in the PSA stated: “However, severe weather conditions can create substantial damage to the electrical system, and restoration can take an extended period of time." That cryptic generality did not contradict the preceding sentence or change the tenor of the Company’s misstatement of its expectation.

Compare Def. Mem., at 15, citing Cumis Ins. Soc., Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 474 (2009) (“false statements of opinion, of conditions to exist in the future . . . cannot sustain a claim under G.L.c. 93A”).

For instance, DPU’s ratemaking decision treats the following facts as settled:
Specifically, the Department found that the Company’s lack of planning and training for a significant storm event left it unprepared to respond to the magnitude of system damage that it experienced during Winter Storm 2008. D.P.U. 09-01-Aat 47. The Department determined that the Company’s lack of planning led to (1) its inability to restore service to its customers in a timely manner; (2) its failure to communicate accurate and useful information to the public; and (3) its failure to coordinate its restoration efforts with local public safety officials. D.P.U. 09-0 l-A at 47. Further, the Department identified failures in (1) the Company’s pre-storm preparation; (2) external resource acquisition; (3) damage assessment; (4) communication efforts with the public, municipal officials, local safety officials, and life support customers; and (5) adherence to its tree trimming schedule. D.P.U. 09-0 l-A at 60, 71-72, 83-84, 121, 125, 127-28, 135, 158-59. The Department concluded that the Company’s numerous deficiencies in preparing for and responding to Winter Storm 2008 resulted in a failure to meet its public service obligation to provide safe and reliable service. D.P.U. 09-010Aat52, 59, 72, 84, 121, 125.